**David Randolph Smith & Associates**
By:    David Randolph Smith, Esq.   (TN Bar. No. 011908)
         (*pro hac vice* motion pending)
1913 21st Avenue South
Nashville, Tennessee 37212
Telephone: 615.742.1775
Fax: 615.742.1223

*Attorneys for Plaintiff Ruth Strontzer*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUTH E. STRONTZER<br>117 Filley Rd.<br>Haddam, CT 06423<br><br>                    Plaintiff,<br>          v.<br><br>JOHNSON & JOHNSON<br>One Johnson & Johnson Plaza<br>New Brunswick, New Jersey 08933;<br><br>ETHICON, INC.<br>U.S. Route 22<br>Somerville, New Jersey 08876;<br><br>MENTOR WORLDWIDE LLC<br>33 Technology Drive<br>Irvine, California 92618.<br><br>                    Defendants. | Civil Action No. 2:20-cv-10160<br><br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

     1.     Plaintiff Ruth Strontzer files Amended Complaint setting forth facts that support

parallel state-law claims that are not preempted by 21 U.S.C. § 360k(a).  As shown herein,

MENTOR® MemoryShape® *textured* breast implant products caused Ruth Strontzer to develop

Breast Implant Associated Large Cell Lymphoma ("BIA-ALCL") -- a rare form of cancer -- as a

direct and proximate result of violations of FDA laws, regulations and requirements applicable to manufacturing, warnings and post-marketing requirements.

2.    Defendants Johnson & Johnson, Ethicon, Inc. and Mentor Worldwide LLC (hereinafter, collectively referred to as "Defendants") cannot avoid civil liability for these defective implants by asserting a preemption defense because Defendants failed to comply with: critical QSR & CGMP requirements required by the Food & Drug Administration ("FDA");  the FDA's Premarket Approval Application requirements; and FDA requirements to warn consumers of the known dangers and known adverse events as required by conditions of approval and post-marketing regulations.

3.    Mentor's SILTEX® breast implant manufacturing process create a textured silicone surface by pressing an uncured silicone mandrel into polyurethane foam. This texturing process produces defective and *adulterated* implants with excessive silicone *debris* fragments and particles that remained on the implant surface in violation of FDA quality system requirements ("QSRs") and current good manufacturing practices ("CGMPs").[1]

4.    Plaintiff brings this action against Defendants in relation to the manufacture, marketing, and distribution of Mentor Breast Implants, the repeated failure to follow the requirements imposed by FDA, failure to warn consumers and healthcare providers of known dangers and known adverse events, and reckless violation of state law.

**PARTIES, VENUE AND JURISDICTION**

[1] The failure to follow the CGMPs and QSRs precludes a preemption defense and provides a basis for liability as violations of federal law that are parallel state law claims. *See Warren v. Howmedica Osteonics Corp.*, No. 4:10 CV 1346 DDN, 2011 U.S. Dist. LEXIS 32643, at *9 n.2 (E.D. Mo. Mar. 29, 2011). In addition, because Plaintiffs allege the implants were "adulterated" by foreign, decomposed and injurious unwanted silicone particles, federal law specifically incorporates CGMPs. 21 U.S.C. § 351.

5.  Plaintiff Ruth E. Strontzer is, and at all material times was, a resident of Connecticut.

6.  Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

7.  J&J's corporate family structure includes a multitude of wholly-owned subsidiaries and affiliated companies all over the world, including Defendants Ethicon and Mentor.

8.  Defendant Ethicon, Inc. ("Ethicon") is a corporation incorporated under the laws of the State of New Jersey, with its principal place of business located at U.S. Route 22, Somerville, New Jersey, 08876.

9.  Defendant Ethicon is a subsidiary of J&J. Its descriptions include the following:





10.  Defendant Mentor Worldwide LLC ("Mentor") is a limited liability company incorporated under the laws of the State of Delaware, with its principal place of business at 201 Mentor Drive, Santa Barbara, California, 93111, and its headquarters at 33 Technology Drive, Irvine, California, 92618.

11.    Founded in 1969, Mentor originally sold electronic laboratory instruments to measure activity within the nervous system. After introducing urethral catheters in the l970s, the company began delving into the plastic surgery field in the mid-l980s.

12.    Mentor now touts itself as the global leader in aesthetic medicine, and the U.S. market leader in breast aesthetics.

13.    Mentor is the only manufacturer whose breast implants are made in the United States.

14.    For more than 30 years, Mentor's products have been implanted into millions of women's breasts and Mentor remains a leading supplier of medical products for the global aesthetic medicine market.

15.    Mentor is a wholly owned subsidiary of Defendant J&J, and describes itself as follows:



16.    J&J acquired Mentor Corporation in January 2009. Under the terms of the acquisition of Mentor Corporation, Defendant Mentor was expected to operate as a stand-alone business unit reporting through Defendant Ethicon, another J&J company.    *See* http://www.investor.jnj.com/releasedetail.cfm?releaseid=361253  (Jan. 23, 2009 J&J press release).

17.    Further, a U.S. Securities and Exchange Commission ("SEC") filing made contemporaneously with the purchase of Mentor made the following statements about the purchase:

- "Mentor will become the cornerstone of a broader J&J leadership strategy in Aesthetic medicine – across consumers and professionals."

- "*Is breast augmentation a good "fit" for J&J and ETHICON?* At J&J and ETHICON, we are committed to bringing forth innovative ideas, products and services to advance the health and well-being of patients. For some, choosing plastic/reconstructive surgery to enhance the way they look and feel can have a significant benefit on self-esteem and overall quality of life. While we are new to the breast implant business, we have served customers with surgical implants that ranged from permanent sutures to surgical meshes, stents, and Orthopedic implants. We believe that by combining forces with Mentor, we can meet the needs of this growing market."

- "*How much of an impact will this transaction have on J&J's sales in 2009?* Bringing Mentor into the J&J family of companies will strengthen our growth prospects in 2009 and beyond. While we do not discuss specific sales numbers, we are confident about Mentor's growth prospects in the coming years."

https://www.sec.gov/Archives/edgar/data/64892/000095013408021428/v50669asc14d9c.htm (emphasis in original) (last viewed July 30, 2020).

18.    Even today, Mentor is identified as one of J&J's "medical companies" And "part of the Johnson & Johnson Family of Companies." *See* https://www.e-ifu.com/ (last visited on July 23, 2020).

19.    The all-important "Instructions for Use" for the Mentor Breast Implant products are provided by J&J for its "Johnson & Johnson Medical Devices Companies." *See id.*

20.    At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other.

21.    The combined acts and/or omissions of each Defendant resulted in indivisible injuries to Plaintiff. Each of the above-named Defendants is a joint tortfeasor and/or co-conspirator

and is jointly and severally liable to Plaintiffs for the negligent acts and omissions alleged herein. Each of the above-named Defendants directed, authorized and/or ratified the conduct of each and every other Defendant.

22.     At all relevant times, Defendants acted in concert with one another in the State of New Jersey to fraudulently convey false and misleading information concerning Mentor Breast Implants, and concealed the risks of serious adverse events associated with its breast implants from Plaintiff, her physician, the public, and other healthcare providers. But for Defendants' actions, Plaintiff would not have suffered the severe injuries and harms that have resulted from implantation of Mentor Breast Implants into Plaintiff's body.

23.     This Court has personal jurisdiction over Defendants. Defendants are, and at all material times were, residents of and/or authorized to conduct business in the State of New Jersey. Defendants conducted such business within the State including acts which caused or contributed to Plaintiffs' injuries.

24.     At all material times, Defendants maintained systematic and continuous contacts within this jurisdiction, employed numerous individuals in this district and regularly availed themselves of the benefits of this judicial district.  Defendants received substantial financial gain as a result of designing, formulating, testing, packaging, labeling, producing, assembling, advertising, marketing, promoting, distributing, manufacturing, and selling the product within this jurisdiction.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the parties.  In addition, Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

26.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

27.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in this federal judicial district.

## FACTS REGARDING MENTOR® BREAST IMPLANTS

### General Information Relating To Breast Implants

28.     Silicones, which are also called polysiloxanes, are polymers that include a synthetic compound made up of repeating chains of alternating silicon and oxygen atoms, frequently combined with carbon and/or hydrogen. Silicones are typically heat-resistant and rubber-like, and are used in sealants, adhesives, lubricants, medicine, cooking utensils, and thermal and electrical insulation. Being purely synthetic, silicones do not exist in nature.

29.     A breast implant is a prosthetic product used to change the size, shape, and contour of a woman's breast. There are three general types of breast implant products, defined by their filler material: saline solution, silicone gel, and composite filler.

30.     Silicone gel-filled breast implants have a silicone outer shell that is filled with silicone gel. They are available in various sizes and can have either a smooth or textured shell. Silicone gel-filled breast implants are approved for breast augmentation in women age 22 or older and for breast reconstruction in women of any age.

31.     In 1976, Congress passed the Medical Device Amendments ("MDA") to the federal Food, Drug and Cosmetic Act ("FDCA"). Upon enactment of the MDA, the FDA deemed saline-filled breast implants as Class II devices, to be reviewed through a premarket notification

process. The devices could be publicly sold so long as manufacturers later provided "reasonable assurance" of the products' safety and effectiveness. 21 U.S.C. § 360e(d)(2).

32.    In 1988, in response to growing safety concerns, the FDA re-classified both saline-filled and silicone gel-filled breast implants as Class III devices requiring premarket approval ("PMA").

33.    In April 1991, upon final publication of new regulations, FDA began requiring breast implant manufacturers to obtain specific premarket approval by the FDA for any silicone gel-filled breast implants.

34.    Through its PMA process, the FDA engages in scientific evaluations of the safety and effectiveness of Class III medical devices. The FDA considers Class III devices to create the greatest risk to human safety, necessitating the implementation of special controls, including the requirement to obtain PMA under 21 U.S.C. § 360 prior to marketing the product to the public.

35.    A PMA application must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue. A PMA and/or PMA Supplement application must provide:

    a.    Proposed indications for use;

    b.    Device description including the manufacturing process;

    c.    Any marketing history;

    d.    Summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk);

    e.    Each of the functional components or ingredients of the device;

    f.    Methods used in manufacturing the device, including compliance with current good manufacturing practices; and

g.     Any other data or information relevant to an evaluation of the safety and effectiveness of the device known or that should be reasonably be known to the manufacturer from any source, including information derived from investigations other than those proposed in the application from commercial marketing experience.

36.     Where Conditional Premarket Approval ("CPMA") is granted, a device marketed by a manufacturer which fails to perform any requirements of the CPMA is considered to be adulterated under § 501 of the FDCA and may not be further marketed.

37.     In November 1991, the FDA held an Advisory Panel meeting to discuss several PMAs for silicone gel-filled breast implants. While the Advisory Panel concluded that the manufacturers had failed to provide adequate safety and effectiveness data for their implants, they unanimously recommended that the FDA permit the implants to remain on the market.

38.     In January 1992, the FDA announced a voluntary moratorium on silicone gel-filled breast implants, requesting that the manufacturers stop supplying them and that surgeons stop implanting them while the FDA engaged in a further review of the products' safety and effectiveness.

39.     In April 1992, the FDA determined that none of the PMAs submitted for silicone gel-filled breast implants contained sufficient data to support premarket approval for silicone breast implants. From that time, implantation of the products in the United States was limited to reconstruction and revision patients.

40.     On December 12, 2003, Mentor submitted a PMA application to FDA for its MemoryGel™ silicone gel-filled breast implants.

41.     On November 17, 2006, the FDA approved Mentor's PMA for its MemoryGel™ Silicone Gel-Filled Breast Implants, subject to certain conditions.  One of the conditions was that Mentor was required to conduct six post-approval studies to further characterize the safety and

effectiveness of its silicone gel-filled breast implants and to answer long term questions that the clinical trials were not designed to answer. Specifically, the FDA required Mentor to: (a) Continue and complete the "Core" post-approval study; (b) Conduct a large post-approval study to assess long-term outcomes and identify rare adverse events and follow patients for ten years; (c) Conduct a device-failure study in concert with their large post-approval study to further identify the modes and causes of failure of explanted devices over the ten-year period; (d) Complete a focus-group study to evaluate how easily patients understand the information in the informed decision brochure about the risks associated with the use of silicone breast implants; (e) Complete an informed decision study to monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants; and (f) Complete the "adjunct" study and continue to follow existing participants through their five-year post-implant evaluations.

42.    Mentor failed to properly perform the six studies, failed to follow up with enough participants and did not fully report adverse events. Accordingly, the information which the FDA was seeking regarding adverse events and device failures was never gathered.

43.    For example, the "Core" study involved 1008 patients and Mentor was required to continue to follow these patients for the ten years following implantation to assess the long-term clinical performance of the silicone gel-filled implants. This was required to include 11 follow-up visits, at six months post-operation, and annually for ten years after surgery.

44.    The FDA also stated that all non-MRI patients should have an MRI at years six, eight, and ten, and that all patients who were explanted without replacement were to be evaluated through ten years.

45.     Mentor was further required to update the patient and physician labeling or its product to reflect the results of the five- and ten-year Core Study findings and to report to the FDA significant new information regardless of when the information became available.

46.     Although the actual follow-up rates for the "Core" study at nine years post-implant were only 59 percent, Mentor reported that the follow-up rate at ten years post-implant was 62 percent.

47.     Furthermore, while the FDA requirements specifically mandated evaluation through ten years, the core post-approval study report schedule illustrates that reporting was only done for six years.

48.     There were also other significant flaws and shortcomings in the information which Mentor provided to the FDA related to this study.

49.     The lack of a sufficient statistical sample, due to the low follow-up rate, as well as the inconsistent data and the failure of Mentor to ensure that the study was completed violated the FDA requirements and significantly limited the information available regarding the long-term effects of use of the product.

50.     The manner in which Mentor conducted the large Post-Approval Study (the "Large" study) and reported the information which it did gather was equally flawed.

51.     The purpose for the "Large" study was to address specific issues such as long term local complications experienced by patients, such as connective tissue disease ("CTD"), CTD signs and symptoms, neurological disease, neurological signs and symptoms; offspring, reproductive, and lactation issues; cancer rates, suicide, mammography issues, rupture results, and MRI compliance.

52.     The study data was to be collected through annual patient questionnaires completed over the internet, by mail, or by telephone.

53.     The study also required physician evaluations at years one, four to six, nine and ten to collect data on complications.

54.     Mentor was required to update their patient and physician labeling to reflect the five- and ten-year study findings, as well as at any other time if necessary, to report significantly new information from the study.

55.     As with the other mandated studies, the follow up rate for the "Large" study was so low that the information obtained was not sufficient to allow for the identification of problems and adverse effects from long term use of the product.

56.     By the seventh year of this study, the overall follow-up rate was 20.1 percent (approximately 8,331 participants out of 41,452), leaving 79.9 percent of the desired statistics unavailable for evaluation.

57.     This was a study of significant importance required by the FDA for post-market approval. The study was designed to address a critical spectrum of health issues for women with breast implants. Mentor did not comply with the required data collection. With nearly an 80 percent dropout rate, the study failed to collect data to demonstrate that use of the Mentor silicone gel implants was safe.

58.     The inadequate results are even more disconcerting because the data collection was designed to examine reasons for reoperation, previously unevaluated, including MRI results, and rheumatologic or neurological symptoms.

59.    The lack of participation and reliable results from this study further shows that Mentor has failed to comply with FDA requirements.

60.    Mentor did not follow through with required data collection. The Year 1 follow-up rate of surgeon visit for study participants was 22.8 percent, leaving nearly 80 percent unaccounted for.  Similarly, the Year 1, 2, and 3 follow-up rates were 21.4 percent, 24.3 percent, and 23.0 percent, respectively, leaving nearly 80 percent unaccounted for.  At Year 7, the overall follow-up rate was 20.1 percent; leaving 79.9 percent of participants unaccounted for and did not have follow-ups for data collection. No follow-up rates were provided for the ten-year data collection.

61.    These follow-up rates were too low for Mentor to provide meaningful safety information to the FDA and insufficient to allow for the identification of adverse effects or other problems resulting from long-term use of the product.

62.    Mentor was also required to conduct a Device Failure Study to ascertain the reasons for, and frequency of, device failure.  Specifically, the FDA required that "Mentor must continue preclinical studies to characterize the long-term modes and causes of failure of explanted retrieved devices for the 10-year duration of the large post-approval study."

63.    The study design involved two components: 1) the collection of implant/surgery information and clinical data at the time of explantation, and 2) visual inspection and physical testing of the explanted devices. No study population was stated, and there was no patient follow-up.

64.    Mentor's Device Failure post-approval study failed to contain an adequate sample size to provide meaningful data.

65.     Further, Mentor's Device Failure post-approval study report of summary findings failed to meet the requirements established by the FDA as it did not list results of the data findings (no clinical data and no visual inspection data), did not list safety findings, did not list any recommendations or summary of safety and data or follow-up on the data, and did not list any changes to labeling, all in violation of the FDA's requirements.

66.     Mentor was also required to conduct a Focus Group Study to gather information regarding the adequacy of the format and content of the approved product labeling.

67.     Mentor used an inadequate number of individuals to properly evaluate how patients understood the safety and labeling brochures.

68.     The FDA also required that Mentor conduct as Informed Decision Study to determine the success of the informed decision process provided to women who seek breast implant surgery. Both the physician and the patient were intended to sign designated sections in order to best assure that the patient had obtained the labeling in sufficient time prior to surgery to read it and understand the risks and other information associated with the Mentor device.

69.     Mentor failed to provide sufficient information regarding the methodology used or the results obtained from this study.

70.     The FDA further mandated that Mentor continue the Adjunct Study, which had been approved in 1992, including the requirement that Mentor continue to follow-up on all patients currently enrolled in that study for five years. The data from this follow-up was to be reported as part of the annual reports required by the FDA.

71.     The Adjunct Study was designed to follow-up with patients post-operatively at Years 1, 3, and 5 to assess satisfaction and occurrence of local complications. The study was to gather data regarding short-term and local (tissue) implant complications.

72.     The overall patient follow-up rates declined as follows:  Year 1 – 44 percent; Year 3 - 24.7 percent; and Year 5 - 13.8 percent.  Mentor sought to attribute the poor follow up rates to a lack of patient compliance.  Mentor also admitted that the lack of sufficient data significantly limited interpretation of the available safety results.

73.     In addition to Mentor's failure to follow up on the Post-Approval Studies, from the time of the investigational device exemption ("IDE") until today, Mentor is solely responsible for designating and reporting all injuries as they relate to its breast implants, and reporting any related injuries to the FDA and health care providers as required under both Connecticut state and federal law. The details regarding this information remain solely in the hands of the Defendants.

74.     Had Mentor properly performed its required studies and reported the multitude of captured adverse events, the FDA would have included the adverse events in the MAUDE database.

75.     Plaintiff allege that if injuries, including the occurrences of diagnosed cases of BIA-ALCL, had been properly reported, Plaintiff and Plaintiff's implanting physician would have been notified of the risk of developing BIA-ALCL with Mentor Breast Implants and would not have chosen Mentor textured implants. Plaintiffs thus aver "but-for causation."

**Information Specific to Mentor MemoryShape Breast Implants**

76.     On June 14, 2013, Mentor's Premarket application for its MemoryShape breast implants was approved by the FDA.[2]

77.     As conditions of approval, the FDA required Mentor to conduct five post-approval studies to characterize the long-term performance and safety of the devices. The post-approval studies for Mentor's MemoryShape silicone-filled breast implants included:

a. **"Post-Approval PMA Cohort Study (PACS)"** - To assess long-term clinical performance of breast implants in the 955 women that enrolled in studies to support premarket approval applications. Prior to approval, this study yielded six years of data, and it was designed to follow these women for a total of ten years after initial implantation.

b. **"Post-approval Continued Access Study (PACAS")** – To collect additional safety and effectiveness data from approximately 350 women who received Mentor's MemoryShape Medium Height Moderate Profile (CPG Style 321) Breast Implants prior to approval but outside of the Core Cohort Study.

c. **"MemoryShape Post-Approval Study (MemoryShape PAS")** - To assess long-term outcomes by enrolling more than 2,500 silicone gel-filled breast implant patients and following them for ten years

d. **"Breast Implant Case-Control Studies To Address Rare Disease Outcomes"** - To identify rare adverse events by enrolling 10,750 women in five case-control studies on rare connective tissue diseases, neurological diseases, brain cancer, cervical/vulvar cancer and lymphoma.

e. **"Focus Group Study"** - To improve the format and content of the patient labeling.

f. **"Device Explant Analyses"** – "Mentor must conduct non-PAS Device Explant Analyses for all MemoryShape Breast Implants . . . retrieved in the commercial

---

[2] A website for J&J's "Medical Devices Companies" touts Mentor's Breast Implants as follows,

MENTOR® MemoryShape® Breast Implants shape the breast and have a unique, tapered appearance. Unlike round breast implants, MENTOR® MemoryShape® Breast Implants are teardrop shaped, meaning they are thinner at the top and gently slope to a fuller projection point near the implant's bottom to mimic the silhouette of a natural breast. The SILTEX® Microtexture Breast Implant gentle imprinting process is designed to help keep implants in place.

https://www.jnjmedicaldevices.com/en-US/product/mentor-memoryshape-breast-implants (last visited on July 23, 2020).

16

setting outside of the post-approval studies." Mentor required to report on these results on an annual basis.

78.     In the PMA, the FDA further stated, "[f]ailure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA."

79.     The FDA continued, "The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law."

80.     Mentor's obligations after the PMA included, but are not limited to:

a.  Reporting to the FDA information suggesting that one of the manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur [21 C.F.R. § 803.50];

b.  Monitoring the product and reporting to the FDA any complaints about its performance and any adverse health consequences that are or may be attributable to the product [21 C.F.R. § 814];

c.  Submitting a PMA supplement for any listed or material changes to the product [21 C.F.R. § 814.39];

d.  Following quality system requirements, found in 21 C.F.R. § 820, the CGMPs, that require manufacturers do the following:

o  Establish and implement a quality policy which all aspects of the manufacturer's operations must meet [21 C.F.R. § 820.20];

o  Establish and maintain procedures for validating the device design, including testing of production units under actual or stimulated use conditions, and creation of a risk plan and conduction of risk analyses [21 C.F.R. § 820.30];

o  Document all Corrective Action and Preventative Actions taken by the manufacturer to address non-conformance and other internal quality control issues [21 C.F.R. § 820.100];

o  Establish internal procedures for reviewing complaints and event reports [21 C.F.R. §§ 820.198, 820.100, 820.20];

- o   Establish Quality Management System (QMS) procedures to assess potential causes of quality problems, including non-conforming products [21 C.F.R. §§ 820.70 and 820.90];

- o   **Maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality [21 C.F.R. § 820.70(e)];**

- o   Ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use [21 C.F.R. § 820.70(g)];[3]

---

[3] The applicable statutes states:

Adulterated drugs and devices
A drug or device shall be deemed to be adulterated—
(a) Poisonous, insanitary, etc., ingredients; adequate controls in manufacture.

(1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2)(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter...

21 U.S.C. § 351 (2019).

Section 351(h) defines an adulterated device, in part, as a device where "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable" CGMP requirements. 21 U.S.C. § 351(h). A CGMP requirement relating to manufacturing material provides:

**Where a manufacturing material could reasonably be expected to have an adverse effect on product quality, the manufacturer shall establish and maintain procedures for the use and removal of such manufacturing material to ensure that it is removed or limited to an amount that does not adversely affect the device's quality. The removal or reduction of such manufacturing material shall be documented.**

21 C.F.R. § 820.70 (emphasis added),

18

> > o **Establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality [21 C.F.R. § 820.70(h)];**

f. Reporting on Post-Approval Studies in a timely fashion [21 C.F.R. § 814.80]; and

g. Advertising the device accurately and truthfully [21 C.F.R. § 801].

81. The primary responsibility for timely and accurately communicating complete, accurate and current safety and efficacy information related to medical device, such as Mentor® Breast Implants, rests with the manufacturer.

82. This primary reporting obligation instills in a manufacturer, such as Mentor, a duty to vigilantly monitor all reasonably available information, to closely track clinical experiences, and to fully and promptly report all relevant information, specifically but not limited to adverse events, to the FDA, the healthcare community, and consumers.

83. Similarly, under state law, which does not impose duties or requirements materially different from those imposed by federal law, the manufacturer must precisely monitor its own manufacturing and quality control processes, and its market representations and warranties.

84. These duties establish that time is of the essence for Mentor when reporting adverse events, especially, but not limited to, those adverse events indicating an association between its product and breast cancer, Anaplastic Large-Cell Lymphoma ("ALCL") and/or BIA-ALCL.

85.     Delayed reporting prevents the healthcare community and the public from timely learning of risks which must inevitably play a part in their decision-making, by both physicians and consumers, regarding treatments and procedures, and thereby expose countless additional women to potential harm.

86.     In 2016, the FDA approved Mentor's revised study protocol to modify the MemoryShape® Post-Approval Study (Requirement 3 in the PMA) to include both MemoryShape® and MemoryGel® devices in one study called the "MemoryGel® and Shape Glow Study."

87.     Based on the approved revised study protocol, Mentor was required to conduct a ten-year post-approval observational study to include a total of 2,518 women undergoing breast augmentation, breast reconstruction, or revision surgery with MemoryShape® or MemoryGel® Breast Implants.

88.     By February and August 2017, Mentor had failed to enroll the required number of participants in the study but nonetheless received a "progress adequate" letter from the FDA as it had met enrollment milestones.  However, the FDA noted that if enrollment rates did not improve, it would not reach the required enrolment rate per the approved study protocol.

89.     In February 2018, Mentor issued the following in a press release – "Mentor Worldwide LLC, a global leader in breast aesthetics *and part of the Johnson & Johnson Medical Devices companies*, announced today the Plastic and Reconstructive Surgery® publication of a U.S.-based 10-year clinical study involving 955 patients which highlights the safety of MENTOR® MemoryShape Gel Breast Implants."  *See* Plastic and Reconstructive Surgery Journal Publishes Ten-Year Clinical Study Data Highlighting Safety of MENTOR® MemoryShape® Gel Breast

Implants, Feb. 14, 2018, available at https://www.jnjmedicaldevices.com/en-US/news-events/plastic-and-reconstructive-surgery-journal-publishes-ten-year-clinical-study-data (last viewed July 31, 2020) (emphasis added).

90.    The report provided information on Mentor's MemoryShape "Breast Implant Core Study". *See id.*

91.    By December 2018, Mentor had enrolled only 102 MemoryShape participants.

92.    On March 18, 2019, Mentor received a warning letter from the FDA setting forth numerous violations of its PMA requirements. *See* Ann M. Ferriter, *Warning Letter to Mentor Worldwide LLC*, March 18, 2019, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/mentor-worldwide-llc-acclarent-573520-03182019 (last viewed July 23, 2020).

93.    The FDA spelled out seven specific compliance failures by Mentor, including:

   a.  Failure to evaluate "the long-term clinical performance of MemoryShape Breast Implants under general conditions of use in the post-market environment."

   b.  Failure to "enroll 2,518 women receiving MemoryShape Breast Implants and 300 women undergoing other aesthetic surgery as the comparison group."

   c.  Failure to "follow the study subjects annually for 10 years."

94.    This letter from FDA was addressed to Alex Gorsky as the Chairman and CEO of Mentor. Gorsky is also, and has been since 2012, the Chairman and CEO of J&J.  *See* https://www.jnj.com/leadership/alex-gorsky (last viewed July 31, 2020).

95.    Mentor was given 15 working days from the date of the letter to provide a plan to address the issues and has yet to comply with this request.

21

96.     After sending the March 2019 warning letter, the FDA allowed Mentor more time to meet its target follow-up and enrollment rates and the opportunity to address the data inconsistencies received in its reports.

97.     In the FDA's March 2019 warning letter, *supra*, the FDA concluded that, based on Mentor's failure to enroll the required number of study participants, the FDA is unable to adequately evaluate the safety, effectiveness and reliability of these implants. The FDA stated, "**[y]ou are thereby in violation of the requirements established as condition to your device's approval under 21 C.F.R. § 814.82(a). Failure to promptly correct this failure may result in withdrawal of your PMA under 21 C.F.R. § 814.82(c).**"  (emphasis added).

98.     In addition to the failures set forth in the FDA's March 2019 waning letter, Mentor also failed to report adverse events, including incidences of BIA-ALCL, from the post-market approval studies commissioned as part of the implant's PMA approval.

99.     Despite its admonitions from the FDA, J&J and Mentor continue to tout the MemoryShape's "Proven Design" as follows:

> Based on a decade of research into the safety and efficacy of breast implants, our Mentor Core Study provides evidence to support the unsurpassed design of MENTOR® MemoryShape® Breast Implants. Clinical data reveals the lowest reported incidence of key complications in primary augmentation at 10 years.

https://www.jnjmedicaldevices.com/en-US/product/mentor-memoryshape-breast-implants (footnotes omitted) (last visited on July 30, 2020).

100.     J&J and Mentor's continued warranties of safety and effectiveness are contrary to the FDA's March 2019 warning letter whereby the FDA explained that it is unable to adequately evaluate the safety, effectiveness and reliability of Mentor's breast implants.  *See* March 2019 warning letter, *supra*.

101.    Had Mentor properly reported the adverse events associated with its breast implants, the FDA would have included those adverse event reports in the MAUDE database.

102.    Upon information and belief, reasonable physicians, including Plaintiff's implanting physician,  Dr. John Burkowski- Middlesex Hospital Middletown, CT., are aware of and visit the MAUDE database and read adverse event reports prior to making product recommendations and  would have seen the adverse event reports related to BIA-ALCL and would have recommended a different and safer breast implant product to Plaintiff.

103.    The adverse events that Mentor did report were reported incorrectly and thus were not made visible to Plaintiff's implanting physician, John Burkowski, M.D.  Mentor reported serious injuries, including death, caused by its breast implants in a summary format that caused the incredibly delayed correct reporting of these adverse events as medical device reports.

104.     In addition to Mentor's failure to properly report events of BIA-ALCL via the MAUDE database and failure provide warnings to Dr. Burkowski of the risk of BIA-ALCL prior to Plaintiff receiving her breast implants, Mentor also failed to properly instruct its sales representatives to provide risk information to Dr. Burkowski.

105.    If called to testify in this case, Dr. Burkowski will provide testimony that he was never informed of the risk of BIA-ALCL by Mentor or Mentor's sales presentative.

106.    Defendants violated other federal requirements including the requirements to:

a.  establish and maintain a quality system. [21 C.F.R. § 820.5];

b.  provide for management responsibility [21 C.F.R. § 820.20];

c.  provide for quality audits [21 C.F.R. § 820.22];

d.  establish and maintain procedures to control the design of the device in ordered to ensure that specified design requirements are met [21 C.F.R. § 820.30];

e.  establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonable be anticipated to have an adverse effect on product quality [21 C.F.R. § 820.70(e)];

f.  Ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use [21 C.F.R. § 820.70(g)];

g.  **Establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality [21 C.F.R. § 820.70(h)];**

h.  establish and maintain procedures for acceptance activities, including inspections, tests, or other verification activities [21 C.F.R. § 820.80];

i.  identify the "conformance or nonconformance of product with acceptance criteria ... throughout manufacturing, packaging, labeling, installation, and servicing of the product to ensure that only product which has passed the required acceptance activities is distributed, used, or installed" [21 C.F.R. § 820.86];

j.  establish and maintain procedures to control product that fails to conform with specified requirements, including the evaluation of non-conforming products [21 C.F.R. § 820.90(a)];

k.  establish and maintain procedures for implementing corrective and preventive action including:

    i.  identifying the cause of product nonconformities,

    ii.  identifying the actions needed to correct and prevent recurrence of nonconforming product and other quality problems,

    iii.  ensuring that information related to quality problems or nonconforming product is disseminated to hose directly responsible for assuring. [21 C.F.R. § 820.100(a)(1)-(7)].

107.  Defendants manufactured its textured implants, including Plaintiff Ruth Strontzer's breast implants, in a manner that violated FDA requirements in the following ways:

a.  Defendants negligently manufactured Mentor textured breast implants using a manufacturing process called the imprint technique that involved inadequately controlled texturing which left silicone particles, debris and fragments from

the textured elastomer shell on the implant surface. *See* Webb, Leland H., et al., Textured Breast Implants: A Closer Look at the Surface Debris Under the Microscope, Plastic Surgery (Oakv). 2017;25(3):179-183, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5626211/?fbclid=IwAR3TG6J1sPsKRK5E3kUlK-5mEeuBudOsYHxPYhIO-z6dE7z0we_TvSrwIRU (last visited on July 31, 2020).

b. This manufacturing process produced *adulterated* implants, including those implanted in Plaintiff , that had silicone particles, debris and fragments on the implant surface in violation of [21 C.F.R. § 820.70(h)] and 21 U.S.C. § 351.

c. Mentor manufactured Plaintiff's breast implants that were in a defective and unreasonably dangerous condition when put to a reasonably anticipated use. They were in fact used in such a manner; and Plainitff's injuries are a direct result of such defects as they existed when the implants were sold and implanted in her body.

d. The presence of silicone particles/contaminants on the surface of breast implants from a flawed manufacturing process is not unique to Mentor. For example, in 2015, a South American breast implant manufacturer (Silimed) lost its ability to market in Europe after an inspection of the manufacturing process found that the surfaces of some devices were contaminated with particles. *See* Brad Perriello, Sientra plummets on U.K. breast implant halt, Sept. 15, 2015, available at https://www.massdevice.com/sientra-plummets-on-u-k-breast-implant-halt/ (last visited on July 30, 2020).

e. Mentor's negligent manufacturing and texturing process produces non-conforming implants that contain silicone particles, elastomer debris, fragments, and contaminants which adhere to the implant surface and are not adequately cleaned and removed prior to sale.

f. Unwanted silicone particles, elastomer debris, fragments, and contaminants are not subject to adequate quality control—making the implants adulterated with foreign silicone particles; refractile and birefringent fragments; residues.

g. These adulterants and contaminants from the silicone implant manufacturing process become embedded into human breast tissue when implanted.

**h. Adulterated medical devices (21 U.S.C.§ 351) are not subject to preemption. 21 C.F.R. § 808.1(d)(2)(ii) provides that, generally, § 521(a) of the Federal Food, Drug and Cosmetic Act (Act) does not preempt a state or local requirement prohibiting the manufacture of adulterated or misbranded devices.**

      i.   There are no confirmed cases of BIA- ALCL associated with smooth breast implants. Mentor's texturing technique, when an implant is negligently manufactured, produces foreign and adulterated silicone particles/fragments on the implant surface that are recognized as a foreign body that triggers T-cell lymphoma and, over time, ALCL.

108.    Eric Swanson, M.D., a world-renowned cosmetic surgeon, has stated as follows: "Textured implants [including Mentor Siltex] are not just "overrepresented" in cases of ALCL. Brody et. al report no cases of ALCL in women treated solely with smooth implants. Similarly, Clemens reports no confirmed cases of ALCL in patients treated only with smooth implants . . . **Brody believes that texturing is the likely trigger,** not infection." Evidence-Based Cosmetic Breast Surgery (2017) (emphasis added).

109.    Another board-certified and well-recognized plastic surgeon (Dennis Hammond, M.D.) made the following comment at a conference relating to BIA-ALCL in Rome last year - "Silicone particle induced inflammation is the primary cause of BIA-ALCL." Presentation at 1st World Consensus Conference on BIA-ALCL (Rome Italy, Oct. 5, 2019), available at https://youtu.be/YxPFayQsjUo?t=24447 (slide presented during his presentation, "The Micro-particulate theory and the role of innate immunity" as part of a scientific panel addressing the etiopathogenesis of BIA-ALCL").

110.    Specifically, Plaintiffs aver that Defendants violated the PMA and federal law and requirements because the PMAs and federal law required Mentor to:

      a.   follow ISO standards (10933-1 and 14607);

      b.   detect, review, and remove impure particles and chemicals;

      c.   remove and dispose of non-conforming implants;

      d.   prevent non-conforming implants and contaminants, fragments, particles, and impurities on the implant from reaching the public;

e.  comply with PMA post-market reporting obligations;

f.  not manufacture adulterated implants defined, in part, by 21 U.S.C. § 351(h) as a device where "the methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity with applicable" CGMP requirements;

g.  follow CGMP requirements, including section 820.70, to "establish and maintain procedures for the use and removal" of manufacturing material that could adversely affect product quality;

h.  not manufacture contaminated products that could be injurious to health;

j.  manufacture its implants securely protected from dust, dirt, and as far as may be necessary by all reasonable means, from all foreign or injurious contaminations;

k.  manufacture implants without any poisonous or deleterious substance which may render the contents injurious to health; and

l.  disclose the risk that silicone particles, particulates, residues or harmful contaminants from the manufacturing process could remain on the implant surface after scrubbing and shipment of the final product.

111.  21 C.F.R. § 808.1(d)(2)(ii) provides that § 521(a) of the FDCA does not preempt a state or local requirement prohibiting the manufacture of adulterated or misbranded devices

112.  These specific allegations of violations of the federal PMAs, laws, regulations, and requirements due to negligent manufacturing in violation of federal law are not subject to federal preemption.[4]

---

[4] See *Gravitt v. Mentor Worldwide*, LLC, 289 F. Supp.3d 877,  (N.D. Ill. 2018) ("The Seventh Circuit [in *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010)] held that because the plaintiff's state law claim "that she was injured by [the defendant's] violations of federal law in manufacturing the device implanted in her hip ... would not impose on defendants any requirement 'different from, or in addition to, any requirement' imposed by federal law," the claim was not preempted. *Id.* at 553 (quoting 21 U.S.C. § 360k(a)(1))."). *See also Money v. Johnson & Johnson*, No. 15-cv-03213-LB, 2016 U.S. Dist. LEXIS 70808, at *9-11 (N.D. Cal. May 31, 2016) (holding such specific allegations of PMA violations are not preempted). *See also Bryant v. Medtronic, Inc.* (In re: Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.), 623 F.3d 1200, 1207 (8th Cir. 2010) (no preemption where plaintiffs alleged defendants "violated a federal requirement specific

113.    A device not manufactured in accordance with the requirements of the PMAs and in violation of CGMPs and "QSRs, the failure to follow the CGMPs and QSRs provide a basis for liability as violations of federal law that are parallel to state law claims.

114.    Mentor violated the CGMPs and Quality System Regulations ("QSRs") set forth in 28 C.F.R.§ 820 *et seq*.

115.     Mentor's  violations of the PMAs and violations of FDA requirements set forth in the QSRs and CGMPs, specifically, failure of 21 C.F.R. § 820.70(h) requiring the removal of manufacturing material that could reasonably be expected to have an adverse effect on product quality, caused Ruth Strontzer's   BIA-ALCL.

116.    Plaintiff's claims are governed by multiple theories of the CPLA, none of which are preempted as they pertain to manufacturing defects.  *See Simoneau v. Stryker Corp.*, 3:13-CV-1200 JCH, 2014 WL 1289426, at *3-6 (D. Conn. Mar. 31, 2014) (plaintiff's CPLA claim for manufacturing defect of a hip implant survives because "manufacturing residuals" left on the

---

to the FDA's PMA approval of this Class III device."). *Accord Sumpter v. Allergan Inc*., No. 4:17-CV-2289 RLW, 2018 U.S. Dist. LEXIS 154467, 2018 WL 4335519, at *2 (E.D. Mo. Sept. 11, 2018); Cf. *Delfino v. Medtronic, Inc*., No. A18-1462, 2019 Minn. App. Unpub. LEXIS 530 (June 10, 2019) (failing to follow FDA manufacturing and performance standards that paralleled state law claims would not be preempted; however, facts failed to show a violation or departure of federal requirements).

Plaintiff avers that where, as here, a complaint alleges both that a device was not manufactured in accordance with the requirements of the PMAs and in violation of CGMPs and QSRs, the failure to follow the CGMPs and QSRs also provide a basis for liability as violations of federal law that are parallel state law claims. *See Warren v. Howmedica Osteonics Corp*., No. 4:10 CV 1346 DDN, 2011 U.S. Dist. LEXIS 32643, 2011 WL 1226975, at *9 n.2 (E.D. Mo. Mar. 29, 2011). In addition — because Plaintiff alleges the implants were "adulterated" by foreign, decomposed and injurious unwanted silicone particles — federal law specifically incorporates CGMPs. 21 U.S.C. § 351.

implant during manufacture was a violation of federal requirements which runs parallel to the state requirements and is not preempted).

117.    Connecticut law permits allegations of generalized CGMPs as sufficient to support a parallel CPLA claim based on strict liability for a manufacturing defect, particularly where "much of the critical information" including PMA specifications for a medical device is "kept confidential as a matter of federal law" and is therefore unavailable to a plaintiff without discovery. *See id.* (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 560 (7th Cir. 2010)).

118.    But for the Defendants' failure to comply with the above requirements, as well as their clearly-established post-market surveillance obligations, Ruth Strontzer would have decided against implantation and her injuries would not have occurred.

119.    Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor had a duty to exercise reasonable care in adequately warning Plaintiff and/or Plaintiff's implanting physician about the dangers of Mentor's Breast Implants, and about all adverse events of which Mentor became aware, and had a post-market duty to identify, monitor and report all adverse events and all risks associated with the product.

120.    Despite having knowledge and possession of evidence showing that the use of Mentor Breast Implants was dangerous and likely to place consumers' health at serious risk, as will be detailed further below, Mentor refused or recklessly failed to identify, disclose and warn of the health hazards and risks associated with the product, and about all adverse events which were known to Mentor.

121.    Instead, Defendants marketed, advertised and promoted the product as safe and effective while at the same time consciously refusing and/or recklessly failing to monitor, warn, or otherwise ensure the safety and efficacy for users of Mentor Breast Implants.

122.    Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor had a duty to revise its product labeling after becoming aware of otherwise undisclosed dangers in Mentor Breast Implants. Mentor refused or recklessly failed to do so.

123.    Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Mentor was required at all material times to promptly report any information suggesting that one of its products may have contributed to a serious injury, or had malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

124.    The FDA publishes the adverse events in a public, searchable Internet database called the Manufacturer and User Device Experience, or "MAUDE," and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

125.    In 2011, the FDA granted an exemption to Mentor for submitting the required adverse event reports related to silicone gel-filled implants by instead submitting post-market spreadsheet reports (PSR) or alternative summary reports (ASR) for "well-known" or expected injuries or malfunctions. *See* FDA Update on the Safety of Silicone Gel-Filled Breast Implants (June 2011) (available at https://www.fda.gov/downloads/medicaldevices/productsandmedicalprocedures/implantsandpros

thetics/breastimplants/ucm260090.pdf (last visited on July 30, 2020). *See also* 21 C.F.R. §§ 803, 803.19.

126.    The summary reporting did *not* apply to reportable death or serious injury events which still had to be reported to the FDA within 30 days. *See* 21 C.F.R. § 803.50. If the FDA finds that a manufacturer has failed to comply with the reporting requirements, they may revoke the manufacturer's summary reporting exemption. *Id.* at §§ 803.19(d), 803.52.

127.    Plaintiffs have reason to believe that the FDA has revoked Mentor's summary reporting exemption for violating its summary reporting requirements. Over the last two years, the number of adverse event reports pertaining to breast implants has increased exponentially.

128.    As of July 18, 2018, the FDA had received 39,406 adverse event reports for breast implants. *See id.* 36 percent of those reports were submitted in the last two years alone. *See id.* Thus, Plaintiffs believe that in July 2017, the FDA rescinded Mentor's privilege to file its adverse events through PSR reports for violation of its reporting requirements hence the enormous uptick in MDR reports filed. In the first seven months of 2018, the number of searchable MDRs grew from 5,158 to 9,019. *See id.*

129.    Some courts have held that adverse event reports are appropriate to show that a defendant manufacturer was *on notice* of potential serious injuries. *See In Re Tylenol Marketing, Sales Practices and Products Liab. Lit.*, 181 F. Supp. 3d 278, 285–86 (E.D. Pa. 2016) ("The extent to which the defendants were on notice of the potentially adverse effects of Tylenol would be relevant to showing how intentional their behavior was in not addressing a potential problem or safety signal").

130.    Here, the adverse event reports would be evidence of Mentor's pre-2011 knowledge of BIA-ALCL. *See In re Gadolinium–Based Contrast Agents Products Liability*, 956 F. Supp. 2d 809, 814-15 (N.D. Ohio Jul. 25, 2013) (finding that adverse event reports represent "a safety signal . . . once a safety signal has been identified, the drug manufacturer must take affirmative steps to investigate").

131.    As summary reports are not publicly accessible through the MAUDE database, they can only be accessed through a Freedom of Information Act ("FOIA") request to the FDA. Mentor's failures in truthful reporting has led to the concealment of adverse event rates of BIA-ALCL and other serious injuries from Plainitff, her implanting plastic surgeon, and the general public.

132.    Defendants' insufficient follow-up rates and inadequate data, as detailed above, establish and confirm Defendants' reckless and intentional disregard for the safety of thousands of women.

133.    Each of the above-cited deficiencies in Defendants' post-market compliance, including those described above, was a "failure to comply with the conditions of approval" and each constituted a ground for withdrawal of the PMA. Defendants' conduct separately violated their duties under the law.

134.    Notwithstanding Defendants' failures to comply with post-approval requirements, including the failures described above, Defendants continued to commercially distribute the Mentor® Breast Implants. As expressly provided in the PMA, such distribution was a violation of federal law.

135.    Had Defendants substantially complied with the PMA, rather than flagrantly under-performing the post-approval requirements as alleged above, Mentor's disclosures would have led to much wider knowledge of the risk of BIA-ALCL associated with Mentor Breast Implants.

136.    Had Defendants substantially complied with the PMA, rather than flagrantly under-performing the post-approval requirements as alleged above, Plaintiff's plastic surgeon, Dr. Burkowski would have learned of the risk of BIA-ALCL associated with Mentor Breast Implants and would have advised Plaintiff Ruth Strontzer to  purchase a safer product.

137.    To protect the Mentor brand, the Defendants intentionally failed in their post-approval study and conditions of approval, and thereby consciously and deliberately concealed its knowledge of known safety risks from the FDA, the medical community, and the public at large. Additionally, the Defendants ignored the available scientific studies and publications indicating an association between textured breast implants and ALCL.

138.    At material times, Defendants routinely maintained manufacturing facilities that failed to comply with applicable law and regulations in relation to:

    a.    The lack of approved software and systems;

    b.    The use of nonconforming products;

    c.    Documents which failed to include data or statistical rationale to support sampling plans used to test saline and gel-filled products;

    d.    The failure to initiate or take corrective action to reassess the results and adjust the values of product bioburden samples;

    e.    The omission of any reference in Defendants' reporting to its manufacturing processes as a potential cause of product failures relating to the inability to sterilize the product;

    f.    Deficiencies in Defendants' sampling methods for finished product testing;

g.    Deficiencies in Defendants' risk analyses and its investigation of non-conformances;

h.    Deficiencies in Defendants' environmental monitoring control procedures; and

i.    Citations to incomplete data and missing statistical or technical rationales to justify the performance of finished product testing.

139.    These deviations contributed to the faulty manufacture of Mentor Breast Implants which were defective and adulterated.

140.    Mentor failed to warn consumers, healthcare providers, the general public, and the FDA that ALCL or BIA-ALCL, and symptomatology attenuated thereto, was a potential risk of Mentor Breast Implants, and that hundreds, if not thousands, of patients had suffered negative experiences and events as a result of such known risk.

141.    The accurate risk estimate of developing ALCL or BIA-ALCL was not disclosed in the product's consumer labeling.

142.    Mentor knew of its manufacturing failures and nonetheless continued to manufacture and sell its adulterated breast implants to the determent of others, including Plaintiff Ruth Strontzer.

143.    Defendants' conduct violated its federal regulatory duties and its duties under state law.  Defendants withheld imperative safety information from Dr. Burkowski and Plaintiff Ruth Strontzer.  Because Defendants failed to timely, completely, or report their knowledge of the accurate risk estimate and complications associated with Mentor Breast Implants, the public's knowledge of the risks associated with Mentor Breast Implants were seriously hampered and delayed.  This endangered patient safety, including the safety of Plaintiff Ruth Strontzer.

**Breast Implant-Associated Anaplastic Large-Cell Lymphoma**

34

144.    Approximately 300,000 total breast implants are placed per year in the U.S.  From 2000 to 2016, the number of breast augmentations in the United States rose 37 percent, and reconstructions after mastectomy rose 39 percent.

145.    BIA-ALCL is a rare T-cell lymphoma that can develop following breast implants. It is a type of non-Hodgkin's lymphoma, a cancer of the cells of the immune system.

146.    The most common presenting symptom for BIA-ALCL is a swollen breast caused by the formation of a delayed unilateral idiopathic seroma occurring between the implant surface and the breast capsule.

147.    Upon information and belief, the first case of ALCL in association with silicone breast implants was diagnosed in the early 1990's.

148.    In November 2008, the Journal of the American Medical Association ("JAMA") published a retroactive analysis of 11 cases of ALCL between 1994 and 2006, and based upon preliminary findings, concluded that the evidence indicated an association between silicone breast prosthesis and ALCL.

149.    In 2011, a summary of published studies, evidence and reports was published that identified 27 cases of ALCL, and concluded that there was an association between breast implants and ALCL.

150.    In July 2014, the United Kingdom's Medicines and Healthcare Products Regulatory Agency ("MHRA") issued a Medical Device Alert "to further encourage healthcare professionals to report cases of ALCL in women who have breast implants or who have had them removed."

151.    In March 2015, an analysis identified 173 cases of ALCL.  That same month, the French National Cancer Institute announced, "There is a clearly established link between the occurrence of this disease and the presence of a breast implant."

152.    On May 19, 2016, the World Health Organization ("WHO") gave the disease an official designation as "BIA-ALCL" and classified it as a distinct clinical entity, *separate from other categories of ALCL*.

153.    In November 2016, Australia's Therapeutic Goods Administration ("TGA") convened an expert advisory panel to discuss the association between breast implants and ALCL and provide ongoing advice.

154.    On March 21, 2017, the FDA released a safety communication updating the current understanding of BIA-ALCL.

155.    In the Updated Safety Alert, the FDA recognized the WHO's designation that BIA-ALCL can occur after receiving breast implants and stated that "[a]t this time, most data suggest that BIA-ALCL occurs more frequently following implantation of breast implants with textured surfaces rather than those with smooth surfaces."

156.    In May 2017, a global analysis of 40 governmental databases identified 363 cases of BIA-ALCL with 258 being reported to the FDA.

157.    A July 2017 article stated that "[e]xperts have called for a common type of breast implant to be banned after it was revealed two people died and 23 developed the same type of cancer in the UK following breast enlargement surgery." Katie Forster, *Calls to ban textured breast implants after two die and 23 develop same type of cancer*, The Independent Online, July 10, 2017, available at https://www.independent.co.uk/news/health/breast-implants-cancer-ban-

two-die-23-develop-same-type-textured-common-women-enlargement-cosmetic-a7832996.html

(last visited on July 30, 2020).

158.    A September 2017 update from the FDA reported that the agency had received a total of 414 MDRs related to breast implants and ALCL, including 9 deaths.

159.    A recent JAMA Oncology article concluded that "[b]reast implants are associated with increased risk of breast-ALCL", but the absolute risk has not been determined. Mintsje de Boer, et al., *Breast Implants and the Risk of Anaplastic Large-Cell Lymphoma in the Breast*. JAMA ONCOL. (published January 4, 2018).

160.    On May 9, 2018, Australia's TGA reported 72 cases of ALCL in Australian patients.

161.    The natural occurrence of this cancer is 1 in 300,000. However, FDA recently cited to studies that place the estimated current risk of BIA-ALCL in women with textured implants to be between 1 in 3,817 and 1 in 30,000. This is consistent with risks reported in Europe. A December 2016 update from the TGA had reported a risk of 1 in 1,000 to 1 in 10,000 for textured implants.

162.    In March 2019, FDA convened a General and Plastic Surgery Devices Advisory Panel ("Panel") to discuss the long-term benefits and risks of breast implants.

163.    The meeting covered a range of topics on breast implant safety, including characterization of BIA-ALCL incidence and risk factors.

164.    The Panel recommended, among other things, that FDA require a boxed warning in breast implant labeling and a standardized checklist as part of the informed consent process and provide greater transparency regarding materials present in breast implants.

165.    In a July 24, 2019 announcement recalling certain breast implant products, the FDA acknowledged 573 cases of BIA-ALCL worldwide and reported "33 patient deaths", a "significant increase" (116 new cases and 24 more deaths) since an update by the FDA in February 2019.

166.    On October 24, 2019, the FDA released a Draft Guidance document (Breast Implants – Certain Labeling Recommendations to Improve Patient Communication (*Draft Guidance*)) ("Draft Guidance") recommending that breast implant manufacturers, including Defendants, add a "boxed warning" on the labeling materials of breast implants. *See* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/breast-implants-certain-labeling-recommendations-improve-patient-communication (last visited on July 30, 2020).

167.    The Draft Guidance specifically states that "FDA believes that a boxed warning should be part of physician and patient labeling materials for breast implants" to ensure that patients are warned that breast implants "have been associated with the development of a cancer of the immune system called breast implant-associated anaplastic large cell lymphoma (BIA-ALCL)". *See id.* at 7, 12. The draft boxed warning and checklist suggested by FDA note that "[s]ome patients have died from BIA-ALCL." *See id.* at 12.

168.    The FDA acknowledged that the currently approved labeling for breast implants are lengthy, "in excess of fifty pages" and that patients "may not be receiving or understanding important information regarding the benefits and risks of breast implants." *See id.* at 6.

169.    In addition to the boxed warning recommendation, the FDA also recommended the use of a patient decision checklist and inclusion of a list of chemical and heavy metal

ingredients found in breast implants to ensure patients are fully informed of the risks of their breast implants.  *See id*. at 8, 13.

170.    The FDA explained, to ensure patients have information of the risks, especially the risk of BIA-ALCL, "a boxed warning, a patient decision checklist, and a patient information booklet/brochure . . . *should be provided by manufacturers and given to patients* prior to implantation." *See id.* at 6 [emphasis added].

171.    The FDA further reminded manufacturers that:

> a device shall be deemed misbranded if, among other things: its labeling is false or misleading; its label does not contain adequate warnings; or any information required to be in the labeling is not prominently placed with such conspicuousness and in such terms to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use (see sections 502(a), 201(n), 502(c), and 502(f)(2) of the Federal Food, Drug and Cosmetic Act (FD&C Act)).

*See id.* at 7 [footnote omitted].

172.    The FDA also recommended patients be given current incident rates of BIA-ALCL in the patient checklist, acknowledging FDA's stance that incidence rates are crucial to an adequate warning.  *See id.* at 8.

173.    According to the American Society of Plastic Surgeons (ASPS), there were approximately 309 both suspected and confirmed cases of ALCL in the United States, and a total of 809 worldwide as of October 25, 2019.  *See* https://www.plasticsurgery.org/for-medical-professionals/health-policy/bia-alcl-physician-resources (last visited on July 31, 2020).

174.    On November 15, 2019, in the Aesthetic Surgery Journal, an article entitled *Commentary on: Comparative Analysis of Cytokines of Tumor Cell Lines, Malignant and Benign Effusions Around Breast Implants*, by Mark R. Magnusson, MBBS, FRACS, it was reported that "around 800 recognized cases [of BIA-ALCL] have been reported worldwide and the incidence

appears to be increasing." Mark R. Magnusson, *Commentary on: Comparative Analysis of Cytokines of Tumor Cell Lines, Malignant and Benign Effusions Around Breast Implants*. Aesthetic Surgery Journal (November 2019).

175.    Upon information and belief, BIA-ALCL is only associated with textured breast implants.

176.    The difference between textured implants and smooth implants is significant:



177.    Despite Defendants' knowledge of an association between breast implants and ALCL dating back to the 1990's, Defendants purposefully failed to comply with their clearly-established post-market surveillance obligations and in doing so have exposed many hundreds of thousands of women to the risk of a life-altering and avoidable cancer.

178.    To date, dozens of countries around the world have banned textured breast implants due to their risk of BIA-ALCL and new bans are being imposed frequently.

179.    Some of those countries that have not banned textured implants have recommended the use of smooth surface over textured.

180.    In July 2019, Allergan's textured breast implants were recalled in the United States for its risk of BIA-ALCL.  In September 2019, this recall was designated by the FDA as a Class I recall, the most serious type of recall for devices that may cause serious injuries or death.

### Mentor And Ethicon Are Controlled By J&J, And Participated In Mentor's Marketing, Promotion And Sale Of Mentor® Breast Implants

181.    Mentor is controlled by J&J and has been since December 2008, well before many of the above-described action occurred.

182.    For example, a December 2008 J&J press release, underscores the importance of the transaction to both entities:

> Johnson & Johnson (NYSE: JNJ) and Mentor Corporation (NYSE: MNT), a leading supplier of medical products for the global aesthetic market, today announced a definitive agreement whereby Mentor will be acquired for approximately $1.07 billion in a cash tender offer. **Mentor is expected to operate as a stand-alone business unit reporting through ETHICON, Inc., a Johnson & Johnson company** and leading provider of suture, mesh and other products for a wide range of surgical procedures.
>
> Under the terms of the agreement, Johnson & Johnson will commence a tender offer to purchase all outstanding shares of Mentor at $31.00 per share. ... The boards of directors of Johnson & Johnson and Mentor have approved the transaction.
>
> The acquisition of Mentor will provide ETHICON with an opportunity to strengthen its presence in aesthetic and reconstructive medicine and raise the standard for innovation and patient outcomes in this market worldwide. Alex Gorsky, Company Group Chairman for Johnson & Johnson with responsibility for the ETHICON business worldwide, said, "The addition of Mentor, a market-leader and one of the most respected companies in the aesthetic space,

expands our capacity to provide physicians with products that can restore
patients' appearance, self-esteem and quality of life. ..."

Josh Levine, President and Chief Executive Officer of Mentor, said,
"ETHICON and Mentor share a common set of values in terms of commercial
market leadership, the commitment to developing innovative, science based
products, and unwavering service to physicians and patients. This transaction
allows Mentor to expand our product portfolio and significantly grow our
global reach. The opportunity to become part of ETHICON, one of the largest
and most respected surgical companies in the world, will have a positive
impact on our business and on all our key constituents."

Upon closing, **the transaction is expected to have a dilutive impact to
Johnson & Johnson's 2009 earnings** per share of approximately $.03 - $.05.
The transaction is expected to close in the first quarter of 2009.

* * * * *

SOURCE: Johnson & Johnson

Formerly available at http://www.investor.jnj.com/releasedetail.cfm?ReleaseID=351111

(bold and underline added).

183.    The press release confirming the acquisition included the following quote from

Gary Pruden, J&J Company Group Chairman, explaining the affiliation between Mentor and J&J,

"**Mentor will become the cornerstone of a broader Johnson & Johnson strategy** for aesthetic

medicine -- serving both consumers and medical professionals. We will use **our combined

strengths and experience** to build a market-leading aesthetic business **that capitalizes on

Johnson & Johnson's broad-based** commercial capabilities, worldwide surgical care footprint,

and       clinical       scientific       capabilities."       Available       at

http://www.investor.jnj.com/releasedetail.cfm?ReleaseID=361253.

184.    J&J's website formerly included the following description: "MENTOR is a

leading supplier of medical products for the global esthetic market.  . . . Used in both breast

augmentation and reconstruction procedures, our implant devices are subject to the strictest design end testing standards." (formerly available at https://www.jjmc.ca/our-products/mentor).

185.    Similarly, a January 31, 2017 announcement on J&J's website touted "the combined technologies and innovations of Ethicon, Inc. and Mentor Worldwide, LLC." *See A Breakthrough in Breast Reconstruction*, available at https://www.jnj.com/caring/patient-stories/breakthrough-in-breast-reconstruction (last visited on July 30, 2020).

186.    The announcement publicized an allograft available from Ethicon to use in conjunction with Mentor's Mentor® Breast Implants. *See id.*

187.    J&J's publication also stated: "Mentor was a natural fit for Ethicon, a leading provider of suture, mesh and other products for a wide range of surgical procedures. In combining forces, Ethicon and Mentor aspire to be the trusted global leader in aesthetic medicine." *Id.*

188.    The announcement also contains a link from J&J's website to Mentor's website.

189.    Further, the "About Us" page on Mentor's former website discussed its acquisition by J&J and Mentor's "Investor Information" tab linked directly to J&J's website, specifically a web page entitled "Corporate Reports" with the J&J banner. (formerly available at https://www.jnj.com/about-jnj/annual-reports).

190.    The current Mentor website consistently identifies Mentor as a J&J "Medical Device Company". Indeed, Mentor's website address is https://www.jnjmedicaldevices.com/en-US/companies/mentor.

191.    Mentor's Customer Support webpage identifies the following email address as the person to contact for "Mentor Media Relations" – ewolfval@its.jnj.com. Upon information and belief, that email address is for Erin Wolf Valich, a long-time J&J employee. Her online bio

identifies her as "Senior Manager, Worldwide Communications & Public Affairs (Mentor and Biosense Webster at Johnson & Johnson Inc."

## FACTS SPECIFIC TO RUTH STRONTZER

192.         Ruth Strontzer had breast cancer in August 2009. She underwent bilateral mastectomies in December 2009 and reconstruction with tissue expanders.   After chemotherapy and left breast radiation, she exchanged the expanders for 700 cc Mentor Siltex breast implants.

193.         In 2014, she developed seroma in left breast and had left implant replaced with another Mentor Siltex implant.

194.         In July 2018, she developed swelling in left breast.  Needle aspiration and fluid analysis confirmed BIA-ALCL.

195.         On July 16, 2018 fluid was collected from her left breast and on August 7, 2018 pathology reported positive T cell rearrangement analysis, favoring T-cell lymphoma (BIA-ALCL) with final interpretation requiring correlation with clinical findings.

196.         On August 15, 2018 pathology tissue from left breast was obtained submitted and on August 16, 2018 a pathology report was issued.

197.         On October 10, 2018 U/S guided aspiration of left breast occurred.

198.         On October 10, 2018 Ruth Stronzer underwent bilateral en bloc capsulectomy and implant removal and pathology confirmed "Breast Implant Associated Anaplastic Large Cell Lymphoma"

199.　　　　Her follow up PET scans showed two areas of concerns. One ended up being a benign tumor in a salivary gland which as removed 11/29/2018. The other was in her abdomen which was believed to be related to a hernia that was repaired.

200.　　　At the time the Mentor implants were placed into Ruth Strontzer's body, she was not advised, nor did she have any independent knowledge, that the Implants were anything other than safe, life-long products. Nor was she advised that the Implants were associated with and/or known to cause ALCL.

201.　　　Plainitff's plastic surgeon, John Burkowski, did not warn Ruth Strontzer about the risk of BIA-ALCL with use of the Breast Implants because he himself was not warned of the risk.

202.　　　Neither Dr. Burkowski nor Ruth Strontzer was advised, and had no independent knowledge, that:

　　　　a.　　A risk of BIA-ALCL existed; or

　　　　b.　　A risk of death attributable to BIA-ALCL existed; or

　　　　c.　　She might need future imaging and/or diagnostic procedures to identify, or evaluate ALCL and/or BIA-ALCL; or

　　　　d.　　She might need future surgery or cancer treatments if she contracts ALCL and/or BIA-ALCL.

203.　　　Defendants were aware of the defects in the Mentor® Breast Implants before Plaintiff's implantation procedure, and the potential for development of BIA-ALCL but did not respond in accordance with their obligations.

204.　　　If Ruth Strontzer had been advised that implantation was associated with even the slightest risk of developing ALCL and/or BIA-ALCL she would not have proceeded with implantation of the Implants.

205.    Had Mentor adequately warned and informed Dr. Burkowski of the risk of BIA-ALCL associated with Mentor Breast Implants, Dr. Burkowski would not have advised Plaintiff to purchase Mentor Breast Implants and proceed with implantation.

206.    Ruth Strontzer suffered tremendously from the pain of her explant surgery, symptoms of her disease, and recovery.

207.    Prior to her development, diagnosis and treatment of ALCL, Ruth Strontzer enjoyed an active, full life, and did not experience the symptoms which arose after the Mentor® Breast Implants were placed in her body. Subsequently, she endured pain, swelling, and embarrassment of her deformed chest.

208.    Defendant Mentor, through its misrepresentations and omissions including its refusals or reckless failures to disclose or report defects and significant events as required by federal law, and by state law which does not impose duties or requirements materially different from those imposed by federal law, concealed from Plaintiff and her healthcare providers the risk of BIA-ALCL associated with its Breast Implants.

209.    All conditions precedent to filing this action have occurred, or have been satisfied or waived.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

208.    Plaintiff hereby incorporates by reference all other paragraphs in this Complaint as if set forth fully herein.

209.    The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions and conduct. Through their affirmative

misrepresentations and omissions, Defendants actively concealed from Plaintiff and other consumers the true risks associated with Mentor® Breast Implants.

210.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that she had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

211.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Mentor® Breast Implants. Defendants were under a duty to disclose the true character, quality and nature of the Products because this was non-public information over which they continue to have exclusive control. Defendants knew that this information was not available to Plaintiff, her medical providers and/or her health facilities, yet they failed to disclose the information to the public.

212.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.

213.    Plaintiff, consumers, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

## PUNITIVE DAMAGES

214.    Defendants' manufacture, marketing, promotion, distribution and sale of a defective product and their failure to provide adequate warnings and instructions concerning its hazards was willful, wanton, and reckless disregard for the public's safety and welfare.

215. Defendants knowingly withheld information, and affirmatively misrepresented information, required to be submitted by federal law, to Plaintiff, the medical community and the public at large, of the safety of Mentor® Breast Implants.

216. Defendants downplayed, understated and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Mentor® Breast Implants despite available information demonstrating that Mentor® Breast Implants was likely to cause serious and potentially fatal side effects to users.

217. At all times relevant hereto, Defendants knew of the defective nature of their Mentor® Breast Implants, and continued to design, manufacture, market, label, and sell Mentor® Breast Implants so as to maximize sales and profits at the expense of public health and safety, with wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by Mentor® Breast Implants, including Plaintiff who did suffer such harm.

218. Defendants misled regulators, the medical community and the public at large, including Plaintiff, by making false and misleading representations about the safety of Mentor® Breast Implants. Defendants knowingly withheld or misrepresented information required to be submitted to the FDA under the agency's regulations, which information was material and relevant to the harm suffered by Plaintiff.

219. As a direct and proximate result of Defendants' reckless, willful and wanton acts in disregard of the safety of the public generally and of Plaintiff in particular, Plaintiff suffered profound injuries which are permanent and continuing in nature, required and will require medical treatment and hospitalization, have become and will become liable for medical and hospital expenses, lost and will lose financial gains, have been and will be kept from ordinary activities

and duties and have and will continue to experience mental and physical pain and suffering, disability and loss of enjoyment of life, all of which damages will continue in the future.

## CAUSES OF ACTION

## COUNT 1 – VIOLATION OF THE CONNECTICUT PRODUCT LIABILITY ACT, Conn. Gen. Stat. §§ 52-572m *et seq.*
### (Against All Defendants)

**The Connecticut Product Liability Act retains a plaintiff's right to allege traditional common law theories of recovery while consolidated under a unified count – violation of the CPLA.**

### A.  Violation of the CPLA - Strict Liability for Manufacturing Defect

220.    Plaintiff re-alleges and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

221.    A recent article relating to complications associated with textured breast implants stated as follows:

> Mentor uses negative-contact polyurethane foam to stamp its Siltex breast implant surfaces. Specifically, a chuck is dipped into uncured silicone to form the shell after which the uncured silicone shell is pressed into polyurethane foam to imprint pores measuring 70 to 150 mm in diameter and 40 to 100 mm in height.

Webb, et al., *Textured Breast Implants: A Closer Look at the Surface Debris Under the Microscope,* Plastic Surgery 2017, Vol. 25(3) 179-183.

1.    This process causes "shedding of surface debris" and this "residual debris from its surface" "may have clinical significance." *Id.*

2.    This "shedding of particulate matter" on the implant surface is a manufacturing defect that, at times, produces an adulterated dangerous and defective product violative of 21 C.F.R. § 820.70(h) and 21 U.S.C. § 351. Such is the case for the Mentor Breast Implants implanted into Plaintiff.

3.    The Mentor Breast Implants that were implanted into Plaintiff were adulterated in that they contained shedded silicone surface debris, as a result of a defective in the product's manufacturing.  The silicone debris became embedded in Plaintiff's  tissue and was recognized as a foreign body which triggered a T-cell lymphoma.

4.    Accordingly, Plainitff's implants are not subject to preemption. 21 C.F.R. § 808.1(d)(2)(ii) provides that, generally, § 521(a) of the FDCA does not preempt a state or local requirement prohibiting the manufacture of adulterated or misbranded devices. The defect is depicted here:



**Figure 4.** Ethylene vinyl acetate copolymer after spallation of the Mentor MemoryGel (Siltex) implant, shown on scanning electron microscopy (A, ×50; B, ×100; C, ×150; D, ×200).

222.    Defendants are strictly liable for Plaintiff's injuries pursuant to Connecticut's Products Liability Act ("CPLA"), Conn. Gen. Stat. §§ 52-572m *et seq*. for:

    a.    Manufacturing their breast implant products in a manner that differed from the specifications agreed to by the FDA;

    b.    Failing to follow CGMPs and QSRs;

    c.    Failing to meet the applicable standard of care by not complying with applicable federal regulations and manufacturing protocols approved by the FDA;

    d.    Negligently failing to ensure a sterile manufacturing environment;

e. Failing to use reasonable care in inspecting and testing the product; and/or

f. Failing to use reasonable care in manufacturing, quality control, and quality assurance processes.

223.    These requirements run parallel to traditional state tort duties in Connecticut to manufacture a product pursuant to its manufacturing standards and specifications.

224.    Plaintiff's claims add no additional requirements than those required by the FDA.

225.    Defendants' Mentor® Breast Implants were in a defective condition at the time of sale, beyond which would be contemplated and expected by the ordinary consumer.

226.    Defendants' Mentor® Breast Implants were expected to, and did reach, Plaintiff without substantial change to their condition which was defective and inherently unsafe and unable to be used without subjecting Plaintiff to an unreasonable risk of injury.

227.    No ordinary consumer would have contemplated that the Mentor Breast Implants she had chosen for reconstruction of her breasts post-mastectomy would cause her an additional cancer.

228.    Neither Plaintiff nor her medical providers could, in the exercise of reasonable care, have discovered the manufacturing defect.

229.    The defective manufacturing of Mentor® Breast Implants caused Plaintiff's injury.

230.    Mentor Breast Implants were manufactured with unwanted surface debris, particles and contaminants from the textured elastomer shell that remained on the implants after manufacture such that they were in a defective condition and unreasonably dangerous at the time they left Defendants' control and were implanted into Plaintiff.

231.    At all material times, Defendants' Mentor Breast Implants were defectively manufactured in a manner that violated the FDA approved manufacturing standards and

specifications. Such violation runs parallel to Plaintiffs' Connecticut based manufacturing defect claim.

232.    The Mentor Breast Implants Plaintiff received were not the breast implants approved by the FDA as they contained non-conforming debris laden defective implants.

233.    Mentor failed to adhere to the specifications imposed and intended by the FDA through the implants' PMA and thus manufactured defective implants containing particles and debris in violation of FDA QSRs and CGMPs) which caused Plaintiff's BIA-ALCL.

234.    Defendants failed to adhere to federal specifications and thus manufactured defective products by:

a.  manufacturing their textured breast implants in a non-conforming manner,

b.  failing to sterilize the implants in conformance with the PMA,

c.  failing to satisfy the study and follow-up requirements set forth in the PMA and other federal requirements,

d.  failing to maintain procedures to prevent contamination of equipment or products, and

e.  failing to timely and accurately submit adverse event reports on the occurrences of BIA-ALCL.

235.    Plaintiff brings this claim pursuant to the CPLA for violations of federal requirements including violations of the following: 21 C.F.R. §§ 814.82(a)(2), (a)(9), and (c), among others.

236.    At all material times, Defendants owed to Plaintiff a duty to use reasonable care, pursuant to the federal post-approval requirements, in conducting and reporting on post-approval studies, monitoring, testing, and adverse events related to Mentor's Breast Implants, including the development of BIA-ALCL.

237.    Defendants breached their duty, pursuant to federal post-approval requirements, by providing defective breast implants to Plaintiff and her physicians.

238.    Defendants breached these duties by: failing to manufacture a safe breast implant so that implantation of such implants would be safe under the ordinary and foreseeable use of Mentor® Breast Implants, by failing to report adverse events, failing to establish and maintain a quality system, failing to provide management responsibility, failure to perform quality audits, failure to maintain procedures to prevent contamination of equipment or product, failure to maintain procedures to ensure that design requirements are met, failure to identify nonconforming products, failure to identify the cause of nonconforming products, failure to identify the actions needs to prevent recurrence of nonconforming products,  and failing to warn of nonconforming products.

239.    Such manufacturing is in violation of state law, which does not impose duties or requirements materially different from those imposed by federal law including the PMA post-approval specifications and regulatory requirements, resulting in product failure and serious injury to Plaintiff.

240.    This claim does *not* add to or change Mentor's manufacturing requirements. Nor does it require that Mentor's breast implants be manufactured in a manner different from the FDA approved manner.

241.    This claim exactly parallels the FDA requirements in that it requires Mentor to manufacture its breast implants in accordance with the FDA regulations and PMA specifications.

242.    Defendants had parallel duties under state and federal law pursuant to the federal post-approval requirements, to exercise reasonable care in manufacturing the products without deviations and defects.

243.    For each of the statutes and regulations cited in this Amended Complaint, Plaintiff is within the class of persons the statutes and regulations are intended to protect, and Plaintiff's injuries are of the type of harm these statutes and regulations are designed to prevent. Defendants were negligent in their manufacture, sale and post-market surveillance of Mentor Breast Implants.

**WHEREFORE**, Plaintiffs demand judgment against each Defendant individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper and appropriate.

**B.   Violation of the CPLA for Breach of Express and Implied Warranties**

244.    Plaintiff re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

245.    Plaintiff brings this claim pursuant to the CPLA which incorporates Connecticut's breach of express an implied warranty theory. Conn. Gen. Stat. §§ 42a-2-314 (implied warranty of merchantability), Conn. Gen. Stat. §§ 42a-2-315 (implied warranty of fitness for a particular purpose), and the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. §§ 42-110b. The CPLA provides a damages remedy for violations of state laws and for violations of federal requirements including 21 U.S.C. § 360c(a)(3)(A).

246.    For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmation of fact made on the container or label." Conn. Gen. Stat. §§ 42a-2-314(2).

247.    In Connecticut, providing a product sample or model can create an express warranty that the goods conform to the sample or model. Conn. Gen. Stat. § 42a-2-313.

248.    As set forth in the manufacturing defect section above, Mentor's breast implants were manufactured in a defective condition that violated the CGMPs, QSRs, and PMA requirements. These defects caused Plaintiff's breast implants to be defective and unfit for their ordinary and intended purpose.  They did not conform to Mentor's implied warranty that they were fit for their ordinary purpose.

249.    Plaintiff's claim for breach of warranty does not add to or differ from the federal requirements and is based on their manufacturing defect claim.

250.    Plaintiff has shown that Mentor's Breast Implants were defectively manufactured and so selling Plaintiff adulterated products breaches the implied warranty of merchantability and is not preempted.

251.    Selling Plaintiff adulterated products amounts to selling products unfit for their intended and ordinary purpose.

252.    This breach of implied warranty, or the selling of defective Breast Implants as though they have met all federal requirements, induced Dr. Burkowski and Plaintiff to purchase the implants and have them implanted, ultimately causing Plaintiff's BIA-ALCL.

253.    Plaintiff seeks to hold Mentor accountable *only* for what federal law mandated - nothing more. Nothing in this claim is different from, or in addition to, the federal requirements.

254.    Defendants impliedly warranted that the product was fit for its particular purpose for which it was intended and of merchantable quality.

255.    Defendants breached the implied warranty of merchantability by selling products that were not of merchantable qualify and were not safe and fit for their intended use.

256.    Such affirmations and promises were made to induce Plaintiff, her physicians and the general public to purchase the products and did in fact induce Plaintiff's physician to recommend, and Plaintiff to select, Mentor Breast Implants.

257.    Plaintiff and Plaintiff's physician relied upon Defendants' implied warranties that the Mentor Breast Implants were manufactured in accordance with federal specifications.

258.    The requirements of truthful and non-misleading warranties do not impose any different or additional requirements on defendants as required by federal law.

259.    Mentor® Breast Implants do not conform to these implied warranties because Mentor Breast Implants were not manufactured in the specifications required by the FDA.

260.    Defendants' breach of implied warranty directly caused and was a substantial factor in causing Plaintiff and Plaintiff's physician to choose Mentor Breast Implants and develop BIA-ALCL and the profound injuries resulting therefrom.

261.    Plaintiff's injuries are permanent and continuing in nature, required and will require medical treatment and hospitalization, have become and will become liable for medical and hospital expenses, lost and will lose financial gains, have been and will be kept from ordinary activities and duties and have and will continue to experience mental and physical pain and suffering, disability and loss of enjoyment of life, all of which damages will continue in the future.

**WHEREFORE**, Plaintiffs demands judgment against each Defendants individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## C. Violation of the CPLA for Failure to Provide Warnings

262.    Plaintiff re-alleges and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

263.    In Connecticut, a manufacture of a defective product owes a duty to warn prescribing physicians and consumers of known risks associated with its products.  This duty to warn the ultimate consumer can be discharged or satisfied if the manufacturer adequately warns the learned intermediary of the risk of injury. *See* Conn. Gen. Stat. § 52-572q(b) and *Fraser v. Wyeth, Inc.*, 857 F. Supp. 2d 244 (D. Conn. 2012).

264.    To state a claim on a strict liability theory of defective labeling under the CPLA, a plaintiff must allege that the product was defective in that adequate warnings or instructions were not provided. *See* Conn. Gen. Stat. § 52-572q(a) (emphasis added).

265.    Likewise, under federal law, manufacturers of medical devices have an affirmative duty to include the FDA approved label with adequate directions for use with its products. *See* 21 U.S.C. § 352(f).

266.    The MDA provides an exemption of this requirement for "prescription devices" if certain conditions are met. *See* 21 C.F.R. 801.109. The label may only be omitted from the product's package if the medical device is one "for which directions, hazards, warnings, and other

information are commonly known to practitioners licensed by law to use the device." *See* 21 C.F.R. 801.109(c).

267.    The FDA approved label for Mentor's Breast Implants including a warning of BIA-ALCL at the time Plaintiff was implanted but this label was not provided to Dr. Lee.

268.    Mentor's Breast Implants were required to carry this label as Mentor did not qualify for the exemption above- specifically, BIA-ALCL was not commonly known and Dr. Burkowski was not aware of this hazard.

269.    Mentor failed to provide a label or warning, in any form, to Dr. Burkowski.

270.    Dr. Burkowski will testify that he reads warnings and that no warnings of BIA-ALCL accompanied the Mentor Breast Implants he implanted in Plaintiff.  He will also testify that he was wholly unaware of the risk of BIA-ALCL associated with Mentor Breast Implants at the time he recommended them to Plaintiff and had he known, would have recommended a safer alternative

271.    In violation of federal law and parallel, genuinely equivalent state claims, Mentor failed to provide warnings of BIA-ALCL, through package inserts, brochures or its sales representatives to Dr. Burkowski who was therefore unable to warn Plaintiff.

272.    The learned intermediary in this case, Dr. Burkowski was not adequately warned of the risk of BIA-ALCL. Mentor thus failed to warn Plaintiff of the risk of BIA-ALCL associated with its implants.

273.    Plaintiff is not alleging that a warning *different from or in addition to* the FDA approved label should have been provided to Dr. Burkowski.  Plaintiff is  alleging that Mentor had

a federal and parallel state duty to provide the FDA approved warning to Dr. Burkowski and failed to do so.

274.    Even assuming, *arguendo*, that a label/warning was provided to Dr. Burkowski, the label's adequacy as to its BIA-ALCL warning is still at issue and is a question of fact.

275.    Had Dr. Burkowski been warned of the risk of BIA-ALCL, he would have recommended a safe alternative and Plaintiff would not have been injured.

276.    The state-based requirement to warn prescribing physicians does not add to or change any federal requirement and therefore is not preempted.

277.    Defendants failed to satisfy its duty to warn Dr. Burkowski and Plaintiff.

278.    Defendants breached their duty by failing to provide any warning of the risk of BIA-ALCL with its Breast Implants to Plaintiff's plastic surgeon.

279.    Defendants' breach of their duty effectively stripped Plaintiff's plastic surgeon, Dr. Burkowski, of the ability to provide accurate risk information pertaining to BIA-ALCL and allow Plaintiff  to make an informed decision about having Mentor's MemoryShape Breast Implants implanted into her body.

280.    Defendants' breach was the substantial and proximate factor in causing Plaintiff's BIA-ALCL and suffering derived therefrom.

281.    Had Plaintiff's plastic surgeon had actual knowledge of the risks of Mentor's MemoryShape Breast Implants, namely the risk in developing BIA-ALCL, he would not have recommended the use of said implants in Plaintiff's body or at the very least, would have provided Plaintiff this information and allowed her to make an informed decision.

282.     Plaintiff would not have developed BIA-ALCL but for Defendants' failure to communicate information pertaining to the risk of BIA-AL:CL to Plaintiff's plastic surgeon.

283.      Pursuant to the parallel state and federal obligations pursuant to the CPLA and federal labeling requirements, Defendants owed Plaintiff and Plaintiff's plastic surgeon a duty to warn of the dangers of BIA-ALCL.

**WHEREFORE**, Plaintiff demands judgment against each Defendant individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### D.  Violation of the CPLA for Negligent Manufacturing

284.     Under Connecticut law, Mentor had a duty to use reasonable care in the manufacture of a medical device intended for human use.

285.     The state common law duty to use reasonable care neither adds to nor changes any federal requirement.  Instead, it is parallel as Mentor would have used reasonable care in its manufacture of its Breast Implants had it adhered to its PMA and post approval requirements.

286.     As set forth above, Mentor was negligent in manufacturing its breast implants without controlling the texturing process leaving silicone particles, debris and fragments from the textured elastomer shell on the implant surface.

287.      As such, Mentor's Breast Implants were manufactured in a defective manner without complying with federal CGMPs, QSRs and PMA specifications.

288.      The Mentor Breast Implants purchased and implanted into Plaintiff were defective and adulterated as they contained silicone debris and particles on the shell. The silicone debris

became embedded in Plaintiff's tissue and was recognized as a foreign body which triggered a T-cell lymphoma.

289.    Adulterated, nonconforming medical devices are not subject to preemption. The duty here, which supports the parallel claim, is the duty to use reasonable care by adhering to the federal requirements, including the general CGMP requirements and the device specific PMA requirements.

290.    Nothing within this claim adds to or changes any federal requirements.

291.    The breach of Mentor's duties, including the CGMP requirements and specific PMA requirements, caused Plaintiff's BIA-ALCL.

292.    Defendants, having undertaken the manufacturing, marketing, prescription, dispensing, distribution and promotion of Mentor Breast Implants described herein, owed a duty manufacture its Breast Implants in accordance with federal requirements.

**WHEREFORE**, Plaintiff demands judgment against each defendant individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### E.  Violation of the CPLA for Negligent Misrepresentation

293.    Under Connecticut law, Mentor had a duty to use reasonable care in its representations.

294.    Under federal law, namely Mentor's PMA, Mentor was required to provide truthful and non-misleading representations about its Breast Implant products.

295.    Mentor knowingly made negligent misrepresentations of fact by selling its Breast Implants that were defectively manufactured as if they were manufactured pursuant to all federal specifications.

296.    Mentor placed its defectively manufactured Breast Implants into the stream of commerce without warning Plaintiff's plastic surgeon Dr. Burkowski.  Mentor knew or should have known that the Breast Implants were defective and so providing the Breast Implants to Dr. Burkowski without warning, giving the presumption of compliant products, amounted to negligent misrepresentation.

297.    Dr. Burkowski and Plaintiff reasonably relied upon the negligent misrepresentation that the products were complaint with the federal specifications and Plaintiff suffered from BIA-ALCL as a result thereof.

298.    The state common law duty to use reasonable care neither adds to or changes any federal requirement.

299.    Nothing within this claim adds to or changes the federal requirements.

300.    Defendants, having undertaken the manufacturing, marketing, prescription, dispensing, distribution and promotion of Mentor Breast Implants described herein, owed a duty to provide accurate and complete information regarding their product.

301.    Defendants negligently misrepresented material information regarding their Breast Implants, namely, that they were manufactured according to required specifications.

302.    Selling Mentor Breast Implants as fully compliant with FDA requirements when in fact they were manufactured with defects is misrepresentation.

303.     Plaintiff reasonably relied upon Defendants' negligent misrepresentations that its Breast Implants were manufactured and sold in accordance with the stringent CGMPs, QSRs, and PMA specification. Plaintiff's reliance caused her to suffer severe and permanent injuries, namely the development of BIA-ALCL, as a result thereof.

**WHEREFORE**, Plaintiff demands judgment against each Defendant individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court

## JURY DEMAND

Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court enter judgment in their favor and against Defendants, awarding Plaintiffs:

a.     actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.     exemplary and punitive damages sufficient to punish and deter Defendants and others from future fraudulent practices;

c.     pre-judgment and post-judgment interest;

d.     costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.     any other relief the Court may deem just and proper.

Dated: August 7, 2020                    Respectfully submitted,


**David Randolph Smith & Associates**

       /s/ *David Randolph Smith*
       David Randolph Smith, Esquire
       1913 21st Avenue South
       Nashville, Tennessee 37212
       Tel.: (615) 742-1775
       Fax: (615) 742-1223
       drs@drslawfirm.com

       *pro hac vice* pending